**James D. BEDWELL, Plaintiff-Appellee,**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY, Defendant-Appellant.**

**No. 11390.**

United States Court of Appeals
Seventh Circuit.

Oct. 3, 1955.

Gerard E. Grashorn, George B. Christensen, Edward J. Wendrow, Chicago, Ill., for defendant-appellant, Winston, Strawn, Black & Towner, Chicago, Ill., of counsel.

Walter N. Murray, John J. Naughton, Chicago, Ill., for appellee.

Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This action was brought under the Federal Employers' Liability Act[1] to recover for personal injuries allegedly caused by defendant's negligence. The jury returned a verdict for $17,500, and defendant appeals from the judgment thereon after denial of its motion for judgment notwithstanding the verdict.

To sustain its appeal, defendant contends that there is a lack of substantial evidence to sustain the verdict and that the district court committed error in submitting an instruction which authorized the jury to find that defendant had violated the air-brake provisions of the Safety Appliance Act.[2]

Plaintiff, a brakeman, was injured on June 18, 1953, at Imlay City, Michigan. During a daylight switching operation of the train upon which plaintiff was working, he, in a manner which is in dispute, suffered an injury to his left arm. At Imlay City defendant has a branch line running in a general northerly and southerly direction which connects with its main east- and west-bound line. The branch line is connected with the main line by a "Y" which extends in a general northeasterly direction to the main line.

Plaintiff's train backed northeasterly onto the "Y". The "Y" track curves to the east and runs parallel to the east bound main line track, crossing Handley Street. It begins paralleling the main line track about 240 feet west of Handley Street, according to a scaled map in evidence. About 411 feet west of Handley Street a transfer track branches off from the lead track and runs east crossing Handley Street.

The crew was required to set off 6 or 7 cars on the transfer track. These cars were in the middle of the train. Three movements were required because of the location of the cars and the tracks available. In the first movement the engine backed the cars onto the lead track and the flagman, King, then cut off 5 cars east of the Handley Street crossing. In the second movement, the engine pulled the remaining cars forward until they cleared the switch which controlled the

1.  45 U.S.C.A. §§ 51–60.

2.  45 U.S.C.A. §§ 1–16.

lead and transfer tracks. Plaintiff then threw that switch lining it with the transfer track and the engine backed the train east on the latter track, where King cut the train east of the street crossing. The remaining 5 cars were then pulled forward to again clear the switch separating the lead track and the transfer track. Plaintiff again threw the switch to line up the "Y" track for the lead track. The third movement was to back down the lead track and couple onto the tail end of the train standing east of the Handley Street crossing. During this movement plaintiff was injured.

There is a dispute in the evidence as to the distance from the street crossing to the nearest car to the east on the lead track. Plaintiff said it was 4 or 5 car lengths or about 160 to 200 feet. Morgan, the conductor, said the distance was only a few feet. Fireman York said it was about 2 car lengths. Brakeman King said it was about a car length.

There is also a dispute as to what duties brakeman King was then performing. Defendant contends that King was protecting the street crossing and was to make the coupling in the third movement, and that he was passing signals to the engine at the time of the accident. Plaintiff contends that after throwing the switch for the third movement onto the lead track, he gave a signal to the fireman that he was going over to the other side, (to the north) which would be the engineer's side, and that he then gave the fireman a slow back-up signal because he wanted to be sure that he could get back on more level ground before catching the lead car, because, as he said, the terrain near the transfer switch was rough,—the ballast there "does not pack down, and it is very slippery." Plaintiff testified that he planned to board the car so as to "flag the crossing", because King was back near the cut of standing cars to make the coupling and because a rule known as 103 required plaintiff to ride the lead car in this move-

ment. The rule, read into evidence, provides *inter alia* [3] that a man must ride on the foremost car to warn persons on the highway.

Plaintiff testified that he walked east about 3 or 4 car lengths from the transfer switch and then he attempted to board from the north side the front end of the lead car which was then about 7 car lengths west of the street crossing. While he was getting on the car, plaintiff estimated the train was moving at least 7 or 8 miles an hour and that the particular movement involved was usually made at a speed of about 2, 3 or 4 miles an hour at that place. He further testified that he mounted the car when it got to him, got a good handhold, put his right foot in the stirrup but did not get both feet in the stirrup, when, after the cars had moved about a half of a car length, there was a sudden jerk, caused by the slack running out of the string of cars resulting from the engineer applying the engine brake instead of the train brake, even though the train had air in the train line system on that day. He testified that the use of the train brake or automatic air brake is to make a smoother stop because it applies the brakes to all of the cars, while the engine brake which is applied to the engine alone causes the slack to run out.

He said that the cars slowed down to 3 or 4 miles per hour and were not stopped. He further testified that the jerk caused him to be thrown around the end of the car, and pulled his feet out of the stirrup although he managed to hang on to the handholds. He was then dragged. He looked for the flagman and saw him giving stop signals, but the engineer did not obey these signals. He further testified that he managed to hold on in this fashion for 4 or 5 car lengths or approximately 250 feet. He further testified that, as he was being dragged along, a wire which operated a switch and extended 7 or 8 inches above the ground, about 15 to 22 feet west of the

3. Rule 103(2) C. N. Rys., G. T. Ry. Sys., D. W. & P. Ry., and C. V. Ry. operating rules.

west side of the crossing caught on his right heel causing his left foot to "flop over," so that the wheel of the train caught his pants leg between it and the rail, breaking his handhold and he fell flat on his back. He tried to crawl away from the train but a wheel caught his left arm and hip and ran up into the muscle and crushed the bone and was just about to go over the shoulder joint when the train stopped.

Brakeman King testified that, after the cars were cut off on the transfer track, he went to the street crossing to protect it, and both he and the engineer testified that from this point King directed the third movement. He said that the maximum speed of the movement was about 8 miles an hour which was attained at about the switch stand, about 150 feet west from where plaintiff claimed he had attempted to mount, and that at the switch stand the engineer shut the throttle off and they "drifted" on a slight upgrade. Fireman York testified that at no time after the movement started did the engineer apply any brakes until the emergency application near the crossing; that the slack never ran out; and that there was no reason for the engineer to apply the brakes at the place where plaintiff claimed that he attempted to mount the lead car.

Engineer Wix testified that the maximum speed attained in backing was about 6 or 7 miles an hour, which was at the switch stand, where he closed the throttle and the engine slowed down to 4 or 5 miles an hour for about 2 car lengths. He further testified that he was looking to the east and as he came around the curve he could see King standing about 8 feet west of the Handley Street crossing and that King was looking toward the engine and giving signals; that the first signal King gave was that there were 2 car lengths to go before the cut would couple onto the standing cars, and that Wix did nothing upon receiving this signal. The next signal was an emergency stop signal, whereupon he applied the brakes in emergency on the engine and cars and stopped in about 14 feet.

He further added that at no time prior to the emergency signal did he see plaintiff during the back-up movement.

Brakeman King said that as the cars were backing towards him at about 4 or 5 miles an hour he saw plaintiff on the fireman's side and when the lead car was about a car length away from the west edge of Handley Street he saw plaintiff start around the end of the car and go over the drawbar, whereupon King looked to the east and signalled the engineer that he had 2 car lengths to go. He said he heard something and turned around and saw plaintiff being dragged by the car, whereupon he immediately gave an emergency signal and the engineer stopped in about half a car length. Plaintiff was then lying on his back just east of the crossing.

While in a hospital four days after the accident plaintiff gave a verbal statement, in question and answer form, to Mr. Prus, an investigator for the defendant. It was reduced to writing by a court reporter. Some of the questions and answers were read by defense counsel to plaintiff at the trial. It was stipulated that these questions and answers occurred during the interview in the hospital. Neither the investigator nor the court reporter testified at the trial. Plaintiff testified that he gave his age, residence, time of accident, and the names of the crew, but he did not remember whether he said the engineer saw him fall although the engineer and the other brakeman both saw him at the same time, "because it was a miracle they stopped when they did." He did not remember being asked this question: "You already were caught underneath the wheel, and a little more movement and they would have cut the arm off?" He said it was possible that he did answer, "Another inch and a half."

As a witness, plaintiff further testified that he probably told Prus that the cars were moving not over 4 miles per hour. He did not remember saying that the train movement was just normal switching. He believed that he said that the engineer was handling these cars in ordi-

nary handling, and that the engineer was "an awful careful man—I have always found him that." He remembered being asked how far he was dragged before he got caught in the "crossing plank" but he did not answer, "Oh, I guess about 5 or 6 feet." He did not remember that that was his answer. He did not remember if he told Prus anything about the train or engine going 8 miles an hour. He did not tell him about the wire on the right-of-way. He further testified that the version which he gave to Prus was the true version as far as he remembered. When asked what answer he gave Prus to the question "What happened?", and whether he gave the following answer, "Well, I got the switch and things motioning him back and started to test (sic) the car, and must have stepped on grease or something and my foot slipped, and the motion of the car backwards started dragging me. I caught a hold with my hand and was dragged along and the crossing plank on the crossing caught my heel and gave me a jerk, and my arm fell across the track.", he said that he did not not remember all of the answer but a part of it was true. He did not remember being asked, "You had already crossed over, were you on the stirrup of the car?" It is possible he had been asked that question and that he answered: "I started falling from the stirrup and the cars' motion of him going backward threw me off balance, and my foot caught on a board on the crossing and jerked my hand loose and dragged me." In answer to this question: "Your version of it was set forth in the questions and answers that were read to you, and those questions were put to you in the hospital and the answers you gave in the hospital, is that right?" plaintiff answered, "It must have been to the best I remember."

He further testified that, while he did tell Prus his foot caught in the planking (of the street crossing) and jerked him from the car, subsequently he found out that a piece of wire had caught his foot. On redirect examination by his own counsel plaintiff testified that he surveyed the place afterwards and found it was the wire which had caught his foot.

The complaint, as amended, charged defendant with one or more of the following acts of negligence: (a) The defendant was careless and negligent in not using ordinary care to furnish the plaintiff with a reasonably safe place in which to do his work; (b) the defendant was careless and negligent in the management, operation and control of "their" train at the time and place set forth; (c) the defendant was careless and negligent in not using the train brake system when slowing down "their" cars with a man riding thereon, when the defendant well knew that failure to use the train brake system would cause the cars to jerk violently, and (d) the defendant was careless and negligent in not obeying the stop signals given to the engineer after the man was jerked from the car when the engineer was in a position to see such signals.

1. The first question of fact which arises in this case is: What caused plaintiff to fall from his position on the lead car? The second question of fact is: Did the negligence of the defendant cause plaintiff to be injured after he had so fallen?

Plaintiff, when he testified as his own witness, was subject to impeachment the same as any other witness would be. Some of the answers which he gave in his statement at the hospital bearing upon the first question were of an impeaching nature, because they were inconsistent with his testimony in court. The court instructed the jury in regard to the law of impeachment and it is to be assumed that the jury considered said instruction in passing upon the credibility of plaintiff as a witness.

However, the answers which he gave at the hospital in regard to what happened after he fell are not substantially different from his testimony in court on that phase of the accident. The accident can actually be divided into two distinct parts, viz.: first, the cause of his losing his footing and falling from the car, and

second, events subsequent thereto. Regardless of what initially caused him to fall, the injury for which he sues is the result of what occurred after he had fallen. His testimony in that regard is that his feet were pulled out of the stirrup although he managed to hang onto the handholds and he was then dragged. No witness denied that plaintiff was dragged. While being dragged he saw flagman King giving stop signals, but the engineer did not obey them. He testified he was dragged about 250 feet, and that a wire located about 15 or 20 feet from the west side of the street crossing caught his right heel and his handhold was broken, resulting in his falling flat on his back. It was then that the injury sued for was inflicted by the car wheel, which crushed the bone and muscle of his left arm.

If the jury believed his testimony in regard to what happened after he fell, they could have come to the conclusion that the defendant was careless both in the management, operation and control of the train, and also in not obeying the stop signals to the engineer at a time when the engineer was in a position to see such signals. It should be remembered that the engineer testified that he was looking to the east and as he came around the curve he saw King standing about 8 feet west of the street crossing looking toward the engine and giving signals. According to plaintiff, he was dragged approximately 250 feet to a point east of the street crossing. King stated that when the engineer stopped, plaintiff was lying on his back just east of the crossing.

While much of plaintiff's evidence as to events after he fell is uncontradicted, some of it is disputed by other witnesses. It was within the province of the jury to determine where the truth lay. We have no right on our consideration of the facts as appearing in the record before us to say that the jury was wrong in the conclusion which it

reached. Defendant says that it does not ask us to make a "mere credibility determination," but it insists that plaintiff contradicted himself on the witness stand, in that he swore to the truth of his statement given at the hospital, which defendant designates as a "no liability version," and which statement, defendant says, is corroborated by the other witnesses. Defendant says that the question presented is one of law,—whether a verdict for the plaintiff under such circumstances is supported by substantial evidence. Pointing to what defendant describes as "fantastic assertions contained in plaintiff's 'liability version'," it submits that plaintiff's testimony does not constitute substantial evidence. It contends that this is an unusual case, in that "the temptation to 'make out a case' here was too strong when weighted against the academic possibility of prosecution for perjury." Defendant reminds us that "the limitations on review do not require a reviewing court to hold its nose and affirm a judgment when it is convinced that the verdict upon which it has been entered is founded on untruth."

As we have pointed out two charges of negligence made in the complaint, as amended, are supported by the evidence given by the plaintiff upon the trial and to that extent nothing in his hospital statement is inconsistent therewith. This evidence is sufficient to support the verdict and the judgment below, and it was not error for the district court to deny defendant's motion for judgment notwithstanding the verdict and its motion for a new trial.

2. The court instructed the jury in regard to the provisions of the Safety Appliance act.[4] The defendant made no valid objection to the giving of this instruction and is not in this court in a position to urge error in that regard.

For the above reasons, the judgment of the district court is

Affirmed.

4. 45 U.S.C.A. §§ 1–16.